# UNITED STATES DISTRICT COURT

for the

Middle District of Alabama

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| 54 Old Dam Road, Goodwater, Alabama, Coosa County, including the residences, all out buildings, and vehicles located at said location. The property is further described in Attachments C & D. | ) ) ) ) |

Case No. 2:19mj 52-SMD

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A (Affidavit)

located in the _____ Middle _____ District of _____ Alabama _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment I

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC §§ 1956, 1957 | Money Laundering |
| 21 USC §§ 841(a)(1), 846 | Possession with Intent to Distribute a Controlled Substance; Conspiracy |
| 31 USC §§ 5313, 5324 | Structuring Transactions to Evade Reporting Requirement |

The application is based on these facts:

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Torey Loftin, Drug Enforcement Administration
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 2/25/2019 _____

_____
*Judge's signature*

City and state: _____ Montgomery, AL _____

Stephen M. Doyle, U.S. Magistrate Judge
*Printed name and title*

**ATTACHMENT A**

**AFFIDAVIT IN SUPPORT OF AN APPLICATION**
**FOR A WARRANT TO SEARCH AND SEIZE**

I, Torey D. Loftin, being first duly sworn, hereby depose and state as follows:

**I.      Introduction and Agent Background**

1.      I am a Special Agent with the Drug Enforcement Administration (DEA) and have been since October 2015.  Prior to my employment with the DEA, I was employed as an investigator for the Federal Bureau of Investigation (FBI) for approximately seven (7) years, preceded by employment as a police officer with the Montgomery, Alabama Police Department for approximately eight years, during which I participated in numerous narcotics investigations.  I have received extensive training in narcotics investigations in areas including, but, not limited to, basic and advanced narcotics training, interview and interrogation, telecommunications exploitation, and surveillance techniques.

2.      As a DEA Special Agent, I have participated in numerous narcotics and financial investigations either as the case Agent or in a supporting role.  I have executed and assisted in the execution of numerous federal and state search warrants that resulted in the arrest of suspects and the seizure of money and narcotics.  I have also interviewed drug dealers, users, and confidential informants and have discussed with them the lifestyle, appearances, and habits of drug dealers and users, as well as the use and meaning of coded language, and the concealment of assets.  I have also participated in other aspects of narcotics investigations including, but not limited to, undercover operations, conducting physical and electronic surveillance, controlled deliveries, execution of warrants, and arrests.  I have monitored meetings and consensual telephone conversations between

1

drug dealers, informants and undercover Agents. I have also supervised or participated in physical surveillance of narcotics traffickers. During these surveillances, I have personally observed narcotics transactions, counter-surveillance techniques, and the methods that narcotics traffickers use to conduct clandestine meetings. Specifically, I have participated in and supported Title III investigations involving the interception of wire communications through monitoring, technical operations, surveillance, arrests, and prosecution.

3.      Based on my training, experience, and participation in drug investigations, I am familiar with drug organizations and know that such organizations often compartmentalize members. They do so to limit a single member's knowledge of the overall organization's operations. In addition, to minimize their risks of apprehension, leaders of drug organizations often attempt to physically distance themselves from drugs and drug proceeds. Therefore, my training and experience has taught me that subordinate members of drug organizations often physically transport drugs and drug proceeds.

4.      I have also conducted and been involved in multiple investigations regarding the laundering of monetary instruments, narcotics trafficking, as well as conspiracies associated with these violations.

5.      I have also had discussions with other law enforcement officers and cooperating individuals about the packaging and preparation of narcotics, methods of operation, and security measures, which are often employed by narcotics traffickers.

6.      I am familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, coded or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

2

7.      I am familiar with the methods used by criminals to launder the proceeds of illegal activities by placing, layering and integrating those proceeds to legitimize the source of the funds. I am also familiar with the methods used by criminals to commit other financial crimes to include, but not limited to structuring deposits. This affidavit, which is based upon my personal knowledge and knowledge obtained from other law enforcement officers, is submitted in support of an application for a warrant to search the following property:

> 54 Old Dam Road, Goodwater, Alabama, Coosa County, including the residences, all out buildings, and vehicles located at said location. The property is further described in Attachments C&D.

8.      From my participation in this investigation, including reviewing the records and reports made available to me by other members of the DEA and local law enforcement officers, I am familiar with the circumstances of the offenses described in the affidavit.

9.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

10.     The application for a search warrant to search the above mentioned properties is based on probable cause to believe that located therein or thereon is evidence related to narcotics offenses as described in Title 21, United States Code, Sections 841(a)(1) and 846.

**II.     Facts and Circumstances Supporting Probable Cause**

11.     This section is intended to provide an overview of the investigation and the organization that is the subject of this application. Specific information and sources for the affiant's knowledge of the facts and circumstances are provided in the text of this affidavit.

12.     On July 24 2017, Agents from the DEA Montgomery Resident Office (MRO) met with Pete Whetstone, Chief of Police of Goodwater Police Department, Goodwater, Alabama,

3

pertaining to drug activity within the Goodwater, Alabama area. During the meeting, Chief Whetstone advised Agents of several individuals in the Goodwater, AL area who were selling powder and crack cocaine, lortabs, heroin and marijuana. Among the individuals mentioned by Whetstone were LeAdam KELLY (A.K.A. Crap), Marcus SMITH, Arthur COX, Brook TURNER, Shawn BRADFORD, Nicholas WHETSTONE, Pete JONES, Octavis KELLY, John KELLY, Randall BRADFORD, Carolyn BRADFORD, Derrick RUSSELL, Ronnie Lee RUSSELL (A.K.A. Flip), Deon GADDIS, Deunte GADDIS, and Andre DAVIS (A.K.A Gutter).

13. On August 17, 2017, Agents from DEA MRO met with a DEA Confidential Source hereafter referred to as CS1 regarding the drug dealing activities of LeAdam KELLY and/or other co-conspirators. During the briefing, CS1 advised that he/she was able to purchase cocaine, both powder and crack, from KELLY and/or his associates. CS1 also advised that he/she believed that KELLY is the biggest seller and/or distributor of cocaine in the Goodwater, Alabama area.

14. Agents from the DEA MRO had recently recruited CS1 during August of 2017 for assistant with gathering evidence against the KELLY Drug Trafficking Organization (DTO). Intelligence collected and provided by CS1 was validated and corroborated by Agents of the DEA MRO, which proved CS1 to be a credible source and/or witness. CS1 also provided agents from DEA MRO with Intelligence regarding the members of KELLY's Drug Trafficking Organization (DTO), which agents were able to validate and utilize to further the investigation against LeAdam KELLY and other known and/or unknown co-conspirators.

15. On September 18, 2017, SA Torey Loftin and Task Force Officer (TFO) Tyler Delashaw conducted a consensual recorded telephone call between CS1 and KELLY. CS1 placed the call to KELLY's number listed as 256-537-1620. During the call, KELLY agreed to sell CS1 one

(1) ounce of crack cocaine for the amount of one thousand dollars ($1000). KELLY also agreed to meet CS1 at his (KELLY) residence on September 19, 2017 in order to conduct the drug transaction.

16.      On September 19, 2017, Agents from the DEA MRO conducted a buy/walk operation in the area of Goodwater, Alabama. During the operation, Agents directed CS1 to purchase one (1) ounce of crack cocaine from KELLY at his (KELLY) residence located at 54 Old Dam Road, Goodwater, Alabama. After arriving at KELLY's residence, CS1 walked toward the front porch and was instructed by KELLY to enter the residence through the front door. After entering KELLY's residence, CS1 observed KELLY sitting on a couch in the living room. CS1 then observed KELLY retrieve the crack cocaine from the black duffle bag located near the sofa that KELLY was sitting on. CS1 then advised that he/she provided KELLY with one thousand dollars ($1000) of Officially Advance Funds (OAF), and preceded to exit the residence. Upon exiting KELLY's residence, CSI advised Agents from the DEA MRO that he/she observed and heard KELLY receive a phone call from another potential buyer requesting one (1) ounce of cocaine.

17.      On October 10, 2017, SA Torey Loftin and TFO Tyler Delashaw conducted multiple recorded consensual telephone calls between CS1 and KELLY in order to arrange a meeting between CS1 and KELLY. CS1 placed a call to KELLY's number listed as 256-537-1620 at approximately 2:03 p.m. on the aforementioned date. During the call, CS1 and KELLY agreed to meet at KELLY's residence located at 54 Old Dam Road, Goodwater, Alabama, to conduct the drug transaction.

18.      On the aforementioned date, Agents from the DEA MRO conducted a second buy/walk operation in the area of Goodwater, Alabama. During the operation, Agents directed CS1 to purchased two (2) ounces of crack cocaine from KELLY at his residence located at 54 Old Dam Road, Goodwater, Alabama. Prior to CS1 purchasing the aforementioned drugs, CS1 arrived at

5

KELLY's residence and parked in KELLY's front yard. After exiting the vehicle, CS1 advised that he/she was met by KELLY in the front yard. CS1 then advised that KELLY motioned for him/her to walk toward his (KELLY) vehicle, a gray Chevy Impala, at which time KELLY opened the hood of the gray Chevy Impala and reached inside of the motor area of the vehicle in an attempt to retrieve something. CS1 then advised that he/she observed a hidden compartment under the hood of the gray Chevy Impala that KELLY was reaching into. KELLY then provided CS1 with two (2) ounces of crack cocaine located inside a clear plastic bag after removing the crack cocaine from a hidden compartment under the hood of the vehicle. CS1 then stated that he/she gave KELLY Nineteen Hundred Dollars ($1,900.00) of the OAF and exited the premises.

19.     On April 13, 2018, DEA SA Torey Loftin and DEA TFO Tyler Delashaw met with another DEA Confidential Source, hereafter referred to as CS2, concerning the drug dealing activities of LeAdam KELLY and other co-conspirators. CS2 advised that he/she had made multiple purchases of methamphetamines from KELLY in the past, with the last purchases occurring during March of 2018 during which CS2 purchased four (4) ounces of methamphetamine for the amount of two thousand four hundred dollars ($2400). CS2 further advised after the transaction was completed KELLY provided him/her with one hundred dollars ($100) for conducting the illegal drug transaction.

20.     Agents from the DEA MRO had recently recruited CS2 during April of 2018 for assistance with gathering evidence against the KELLY Drug Trafficking Organization (DTO). Intelligence collected and provided by CS2 was also validated and corroborated by Agents of the DEA MRO which proved CS2 to be a credible source and/or witness.

21.     On May 03, 2018, while within the Goodwater, Alabama area, SA Loftin and DEA

TFOs Tyler Delashaw and Sheena Tarver met with CS2 at a predetermined location (PL) in order to brief and prepare for a meeting between the CS2, LeAdam KELLY, and Tyreese HICKS.

22.     On the aforementioned date, at approximately 12:35 PM, CS2 placed a consensual and/or controlled call to HICKS number listed as 256-252-5591.  The consensual call between CS2 and HICKS was recorded by a digital recording device and monitored by SA Loftin and TFOs Delashaw and Tarver.  After the call was completed, SA Loftin and TFO Delashaw debriefed CS2 regarding the conversation with HICKS.  CS2 advised that HICKS advised him/her to come to KELLY's residence located at 54 Old Dam Road, Goodwater, Alabama in order to pick up approximately two (2) ounces of methamphetamines "ICE" for the amount of twelve hundred dollars ($1200.00).

24.     Agents then debriefed and/or prepared CS2 for a buy/walk with KELLY and/or HICKS.  Prior to CS2 leaving the PL, CS2 and the CS2's vehicle were search for contraband by SA Loftin along with TFOs Delashaw and Carver with negative results.  Agents then provided CS2 with multiple electronic listening devices to utilize during the meet with KELLY and/or HICKS.  CS2 then exchanged text messages with HICKS in order to confirm and/or facilitate the illegal drug deal. CS2 was then provided $1200 of (OAF) in order to acquire the drugs from KELLY and/or HICKS.

25.     CS2 then left the PL and SA Loftin and TFO Delashaw followed CS2 to KELLY's residence located at 54 Old Dam Road, Goodwater, Alabama to acquire the narcotics.  At approximately 2:05 PM, Agents observed CS2 arrive at KELLY's residence at which time DEA SA Bryan Alfultis observed an unknown black male (b/m), later identified as HICKS, approach the passenger side of CS2 vehicle.  At approximately 2:06 PM, SA Alfultis observed HICKS walk away from CS2 vehicle and enter KELLY's residence.  At approximately 2:08 PM, SA Alfultis observed

HICKS sitting inside CS2 vehicle on the passenger side. At approximately 2:10 PM, SA Alfultis observed HICKS exit the CS2 vehicle, at which time the CS2 left KELLY's residence and was followed back to the PL by TFO Delashaw and SA Loftin.

26.     After CS2 arrived at the PL, CS2 provided SA Loftin and TFO Delashaw with a clear plastic bag containing a white and/or clear rock like substance believed to methamphetamines "ICE". SA Loftin and TFO Delashaw, along with other Agents, then searched the CS2 and the CS2's vehicle a second time for contraband with negative results.

27.     Agents then debriefed CS2 in regards to the buy/walk with KELLY and/or HICKS. CS2 advised that he/she arrived at KELLY's residence (54 Old Dam Road Goodwater, Alabama) and was getting out of the vehicle at which time he/she was approached by HICKS who walked up to CS2's vehicle. CS2 then stated HICKS entered his/her vehicle. CS2 then stated that HICKS sat in the vehicle and told him/her that he (HICKS) needed to make sure the money was good because he (KELLY) would get angry if the money was not the right amount. CS2 then stated that he/she could see KELLY standing at the door inside of the residence. The CS stated he/she counted $1200.00 of OAF and gave HICKS the $1200. CS2 stated that HICKS recounted the $1200.00 of OAF, exited the vehicle and went inside KELLY's residence. CS2 further stated that after a few minutes had passed, HICKS exited KELLY's residence and entered CS2's vehicle with two (2) plastic bags containing what appeared to be "ICE". CS2 further stated he/she could see KELLY looking out of the residence from the front door the entire time. CS2 also stated that HICKS advised him/her to call him ("HICKS") anytime and he would be ready to sell CS2 additional drugs.

28.     On July 12, 2018, DEA SA Loftin and TFO Delashaw conducted a consensual and/or recorded controlled telephone call between CS2 and KELLY. After the call was completed, SA

8

Loftin and TFO Delashaw debriefed CS2 regarding the conversation with KELLY. CS2 advised that he/she informed KELLY that he/she ("CS2) was the one that came to his (KELLY) residence previously to acquire methamphetamines ("Ice"). CS2 advised that he/she informed KELLY that HICKS provided CS2 with the methamphetamines on behalf of him (KELLY). CS2 advised Agents that KELLY informed him/her that he would contact HICKS and let him (HICKS) know that he/she was trying to get in touch with him (HICKS) in order to acquire drugs.

29.     On the above aforementioned date, while in the Sylacauga, Alabama area, DEA SA Loftin and TFO Delashaw conducted a consensual and/or recorded controlled telephone call between CS2 and HICKS. After the call was completed at approximately 4;22 PM, SA Loftin and TFO Delashaw debriefed CS2 regarding the conversation with HICKS. CS2 advised that the call between him/her and HICKS revolved around the CS2 purchasing an additional one (1) or two (2) ounces of meth "ICE" from HICKS and/or KELLY. CS2 advised HICKS told him/her to call him (HICKS) when he/she was ready to purchase the illegal drugs. CS2 advised HICKS told him/her that two (2) ounces of "ICE" would be $1300.00 and further advised that he (HICKS) would have the "clock and/or scale" to make sure it was right.

30.     On August 16, 2018, Chief United States Magistrate Judge, Middle District of Alabama, Wallace Capel Jr. signed a court order for the installation of a pole cam in the area of 54 Old Dam Road Goodwater, Alabama. The camera was activated on August 29, 2018 and viewing access was provided to SA Loftin and TFO Tyler Delashaw on August 29, 2018.

31.     On September 28, 2018 SA Loftin and TFO Delashaw accessed and viewed archived footage the pole camera on 54 Old Dam Road Goodwater, Alabama. The footage viewed was captured on September 6, 2018. The pole camera showed a heavy set black male wearing shorts, tee

shirt and a baseball hat next to a four Door Nissan Altima. The black male was observed with a slender black male wearing shorts, white tee shirt with short dreadlocks. The pole camera showed the two black males received what appeared to be clothing from the driver of the Nissan. The heavy set black male is observed walking back to the Nissan and handing the driver a clear plastic bag containing a white substance. Based on your affiant training and experience, it is the affiant's belief that the heavy set black male handed the driver of the Nissan cocaine hydrochloride.

32.     On the aforementioned date, SA Loftin and TFO Delashaw accessed and viewed archived footage the pole camera on 54 Old Dam Road Goodwater, Alabama. The footage viewed was captured on September 9, 2018. The pole camera showed a heavy set black male wearing shorts and a white tee shirt standing next to a four door passenger car. The heavy set black male is observed with a clear plastic bag containing a green leafy substance in his hand and walking towards the residence (54 Old Dam Road Goodwater, Alabama).

33.     On December 17, 2018, SA Loftin and TFO Delashaw accessed and viewed archived video surveillance from pole camera footage of 54 Old Dam Road Goodwater, Alabama (residence of LeAdam KELLY). The pole camera uncovered footage on December 14, 2018, of an unknown black male arriving at KELLY's resident in a silver or gray four (4) door Nissan Sedan at approximately 12:50 PM, Central Standard Time (CST). The unknown subject hereafter referred to as "UnSub", was observed wearing white and/or blue stonewashed pants, along with a gray shirt and orange ball cap. The UnSub was also observed on the video mixing two (2) unknown type pill or medicine bottles, with a clear liquid, inside of what appeared to be a clear plastic soda bottle. Based on your affiant and TFO Delashaw's experience with drug dealers' methods for preparing certain drugs, Agents believe that the UnSub was mixing codeine based prescription medicine with

soda, which is referred to as the street drug "Lean" and/or "Purple Drank", in which users sip on and drink for long durations in order to get high. The aforementioned street drug is currently categorized as an Opiate.

34.     On January 3, 2019, SA Loftin and TFO Delashaw accessed and viewed archived video surveillance from pole camera footage of 54 Old Dam Road Goodwater, Alabama (residence of LeAdam KELLY). The pole camera uncovered footage on January 3, 2019 of an unknown black male arriving at KELLY's resident in a black (4) door Chevrolet Avalanche at approximately 9:07 AM, Central Standard Time (CST). The unknown subject hereafter referred to as "UnSub" was observed wearing gray sweat pants, along with a gray shirt and black ball cap, and in possession of rifle in his (UnSub) right hand.

35.     At approximately 9:10 AM CST, on the same date, the UnSub was observed exiting KELLY's residence with a yellow plastic bag in his left hand along with the aforementioned rifle located in his right hand. The UnSub then opened the driver's side rear door and placed both the rifle and the yellow bag into the vehicle. The UnSub then entered the vehicle and exited the premise.

36.     On February 1, 2019, Agents from the DEA Montgomery Resident Office (MRO) conducted surveillance in the area of LeAdam KELLY's residence, located at 54 Old Dam Road, Goodwater, Alabama. During the surveillance at KELLY's residence, agents from the DEA MRO observed drug activity at KELLY's residence through surveillance and the utilization of a pole camera. During this surveillance operation along with Coosa County Sheriff Office, Tallapoosa County Narcotic Task Force, Alabama Law Enforcement Agency, and the Federal Bureau of Investigation, law enforcement officers were able to arrest and apprehend four subjects in possession of illegal drugs after arriving at KELLY's residence and leaving in possession of illegal drugs. Of

11

the four individuals arrested, Clifford RUSSELL was taken into custody and charged with Possession of Marijuana 1st by Coosa County Sheriff Office. RUSSELL was found to be in possession of an unknown amount of marijuana as well as an undetermined amount of U.S. Currency.

37.     On February 6, 2019, SA Loftin and TFO Delashaw accessed and viewed archived video surveillance from pole camera footage of 54 Old Dam Road Goodwater, Alabama (residence of LeAdam KELLY). The pole camera uncovered footage on February 5, 2019, of an unknown black male, arriving at KELLY's residence at approximately 11:56 AM, Central Standard Time (CST), in a 2008 dark blue four (4) door Honda CR-V, Alabama license number 9117ATO, registered to a Gleen Annie LEONARD of 556 Weogufka Street, Goodwater, Alabama 35072.

38.     The unknown subject hereafter referred to as "UnSub", was observed exiting the passenger side of aforementioned vehicle wearing a dark blue shirt and camouflage pants, in possession of black handgun in his (UnSub), right hand. At approximately 11:57 AM, the UnSub was observed on the pole camera handing another unknown male wearing a dark blue jacket and camouflage pants, hereafter referred to as "UnSub 2", an undetermined amount of U.S. currency.

39.     At approximately 12:43 AM CST, on the same date; while viewing additional archived video surveillance from February 5, 2019, SA Loftin observed UnSub 2 standing next to the passenger side of a gray Honda Accord. On the same date, archived video surveillance from February 5, 2019, showed Roderick HOYETT arriving at KELLY's residence at approximately 11:12 AM, driving a gray Honda Accord, license number 6660AF3, registered to a Janice T. HOYETT of 192 Weogufka Street, Goodwater, Alabama. SA Loftin then observed UnSub 2 take a

12

black handgun from his front right pant pocket and remove the magazine. At approximately 12:44, SA Loftin observed Unsub 2 drop or release the magazine from the handgun, at which time the magazine fell to the ground. UnSub 2 then retrieved the magazine from the ground and reloaded the hangun. UnSub 2 then placed the handgun in the front right pocket of the dark blue jacket that he (UnSub 2) was wearing, while talking to Tyreese HICKS AKA: TY, who was also present in front of KELLY's residence, wearing a black sweat shirt and gray sweat pant and a dark colored beanie.

40.     At approximately 12:45 PM CST, SA Loftin and TFO Delashaw observed LeAdam KELLY walk up, and began communicating with Roderick HOYETT, Tyreese HICKS, UnSub 2, and another unknown black male in front of his (KELLY) residence.

41.     On February 20, 2019, SA Loftin and TFO Delashaw accessed and viewed archived video surveillance from pole camera footage of 54 Old Dam Road Goodwater, Alabama (residence of LeAdam KELLY). The pole camera uncovered footage on February 08, 2019, of Roderick HOYETT arriving at KELLY's residence at approximately 11:12 AM, Central Standard Time (CST), in a gray four (4) door Honda Accord. At approximately 11:14 AM, Agents observed an unknown black male, wearing a red jacket and blue sweat pants, talking to Micah POPPELL, who was observed by Agents driving away from KELLY's residence in his white 2009 Ford Ranger. Agents then observed the unknown black male walk toward HOYETT in the gray Honda Accord. Subsequent to the unknown black male approaching HOYETT's vehicle, Agents observed an unknown black female driving a 2013 four (4) door Silver Ford Edge bearing Alabama license number 22AP351, registered to a Harrold GRANT and/or Peggy HUTCHINS of 3514 Robinson Road, Alexander City, arrive at KELLY's residence and park in front of the gray Honda Accord being driving by Roderick HOYETT.

13

42.     At approximately 11:14 AM, both the unknown black male and female approached HOYETT's vehicle.  The unknown black male approached HOYETT's vehicle from the passenger side door and the unknown black female from the driver's side door.  At approximately 11:15 AM, Agents observed HOYETT hand the unknown black male a white substance in a clear plastic bag. At approximately 11:16 AM, Agents observed HOYETT hand the unknown black female a white substance in a clear bag, at which time the unknown black female walked back toward the 2013 silver Ford Edge, entered the vehicle and exited the area.

43.     On the same date, February 20, 2019, Agents continued to view archive video footage from February 9, 2019 of KELLY's residence located at 54 Old Dam Road, Goodwater, Alabama. At approximately 4:09 PM, CST, on the aforementioned date, Agents observed Javirous "Fred" WILSON and another unknown black male arrive at KELLY's residence in a 2008 Chevrolet Suburban, registered to a Duncan Ayana NATAKA of 947 Coosa County Road, Goodwater, Alabama.  At approximately 4:10 PM CST, WILSON and the unknown black male exited the vehicle being driven by WILSON, at which time the unknown walked toward KELLY's residence. At approximately 4:12 PM, the unknown black male was observed walking toward a gray Honda Accord with Roderick HOYETT.  At approximately 4:13 PM CST, Agents observed the unknown black male hand HOYETT an undetermined amount of what appeared to be U.S. currency.  At approximately 4:14 PM CST, Agents observed HOYETT hold the money up in the air and look at the money, in which Agents believed HOYETT was checking to ensure that the money was authentic.  At approximately 4:15 PM CST, Agents observed HOYETT give the unknown black male a white substance contained inside a clear plastic bag, at which time the unknown black male retrieved the white substance and walked by toward WILSON.  At approximately 4:18 PM CST,

14

WILSON and the unknown black male entered WILSON vehicle and exited KELLY's property.

44.     On the same date, February 20, 2019, Agents continued to view archive video footage from February 10, 2019, of KELLY's residence located at 54 Old Dam Road, Goodwater, Alabama. At approximately 11:17 AM, Agents observed Roderick HOYETT and an unknown black male arrive at KELLY's resident driving a gray Honda Accord, bearing Alabama license plate 6660AF3, registered to a Janie T. HOYETT of 192 Weogufka Street, Goodwater, Alabama. At approximately 11:18 AM, CST, on the aforementioned date, Agents observed a silver Ford Edge arrive at KELLY's resident at which time Clifford RUSSELL walked toward the vehicle and begin communicating with the unknown subject driving the silver Forde Edge. At approximately 11:19 AM, RUSSELL walks away from the vehicle and heads toward KELLY's residence. At approximately 11:21 AM, RUSSELL retuned to the silver Ford Edge and hands the driver of the vehicle an unknown substance in what appeared to be a clear bag. RUSSELL then receives undetermined amount of U.S. currency from the driver, and walks away from the vehicle at approximately 11:21 AM.

45.     On the same date, February 20, 2019, Agents continued to view archive video footage from February 10, 2019, of KELLY's residence located at 54 Old Dam Road, Goodwater, Alabama. At approximately 2:04 PM, Agents observed RUSSELL arrive at KELLY's residence driving a silver Chevrolet Impala. At approximately 2:06 PM, RUSSELL grabs a brown backpack from the back seat and removes a blunt and/or cigar. RUSSELL then begin to split the blunt and/or cigar in half and remove the enter contents of the blunt and/or cigar. RUSSELL then removes a clear plastic bag containing an unknown substance, and begins to fill the blunt and/or cigar with the unknown substance taken from the backpack. RUSSELL begins to lick and roll the blunt and/or cigar at which time he places the blunt and/or cigar down, and lights what appears to be a cigarette.

15

46.     On February 21, 2019, SA Loftin and TFO Delashaw accessed and viewed archived video surveillance from pole camera footage of 54 Old Dam Road Goodwater, Alabama (residence of LeAdam KELLY). The pole camera uncovered footage from February 15, 2019, of an unknown black female, arriving at KELLY's residence at approximately 12:14 AM, Central Standard Time (CST), driving a gold 2006 four (4) door Honda Civic bearing Alabama License number 22AN725 registered to a Lashayla COLEMAN of 124 Mountain Street, Goodwater, Alabama.

47.     On the same date and time, while viewing additional archived video footage from February 15, 2019, of KELLY's residence,  Agents observed the unknown female, later identified as Lashayla COLEMAN through investigative means; standing next to a gray Honda Accord with an unknown male occupant sitting in the driver seat at approximately 12:15 PM. Agents further observed COLEMAN standing next to the driver's side door of the gray Honda Accord with what appeared to be money in her (COLEMAN) right hand.  Agents then observed the unknown male inside of the vehicle with what appeared to be a clear plastic bag in his hands. Agents then observed COLEMAN reach into the vehicle and make an exchange with the unknown male and walk back toward her vehicle and depart KELLY's residence at approximately 12:16 PM.  At approximately 12:17 PM, Agents observed Roderick HOYETT exit the driver's side of the gray Honda Accord.

48.     On the same date and time, while viewing additional archived video footage from February 17, 2019, of KELLY's residence, Agents observed an unknown black female arrive at KELLY's residence at approximately 1:08 PM CST, driving a silver Ford Edge. The unknown black female then exited the vehicle and walks toward KELLY's residence. The unknown black female is then observed by Agents returning to her vehicle with at approximately 1:16 PM with a clear plastic bag containing a white substance in her right hand.  The unknown black female then enters the

vehicle and exited the premises at approximately 1:17 PM.

49.     On February 21, 2019, SA Loftin and TFO Delashaw accessed and viewed archived video surveillance from pole camera footage of 54 Old Dam Road Goodwater, Alabama (residence of LeAdam KELLY). The pole camera uncovered footage on February 18, 2019, of an unknown black male, arriving at KELLY's residence at approximately 11:48 AM, Central Standard Time (CST), in a black four (4) sedan. The unknown male exited the vehicle at approximately 11:46 AM and walks toward KELLY's residence. The unknown male returned back to the black sedan at approximately 11:48 AM and entered the vehicle. The unknown male was then observed removing a cigar and/or blunt from a clear plastic bag, then splitting the cigar and/or blunt in half while filling it with an unknown type substance also located in a clear plastic bag.

50.     Based on your affiant and TFO Delashaw's training and experience investigating drug dealers, as well as drug dealers' methods for preparing certain drugs, Agents believe that the UnSub went into KELLY's residence in order to purchase illegal drugs, possibly marijuana. Agents further believe that the UnSub returned to the black sedan with the illegal drugs, and preceded to fill the blunt and/or cigar with marijuana which is common for most drugs dealers or drug users to do when smoking marijuana while utilizing a blunt or a cigar.

51.     Based on my training, experience, and participation in numerous investigations involving narcotics importation and distribution organizations and in financial investigations involving large amounts of controlled substances, currency and other monetary instruments, I know:

> a.  That large-scale narcotics traffickers commonly maintain on hand large amounts of U.S. Currency in order to maintain and finance their ongoing narcotics business; that

these drug proceeds are normally kept at a location where the narcotics trafficker has ready access to the money (such as a residence);

b. that individuals engaged in narcotics trafficking and/or money laundering commonly maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other paper relating to the illegal distribution of controlled substances; that these same individuals commonly "front" (provide on consignment) narcotics to their clients; that the aforementioned books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers are maintained where the narcotics traffickers have ready access to them (such as at the narcotics traffickers residence);

c. narcotics traffickers and those engaged in the laundering of money commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers for their associates in the trafficking organization;

d. that narcotics traffickers utilize highly sophisticated organizations to conceal their illegal activities and invest large sums of money in the formation of companies or corporations to serve as front companies which serve to conceal their illegal narcotics trafficking activities;

e. that these businesses, which outwardly appear to be legitimate, are the focal point of the illegal enterprise and are often the repository of the proceeds of narcotics trafficking, or assets obtained as a result of said trafficking;

f. that the businesses intimately associated with narcotics traffickers conceal and maintain books, records and documents which have been created by individuals

engaged in the narcotics trafficking and money laundering;

g.  that, in order to accomplish this concealment, narcotics traffickers frequently build "stash" places within their residences or businesses. That there are a number of publications available instructing where and how to build "stash" places. Copies of these types of publications have been found in the residences and businesses of narcotics traffickers;

h.  that it is common for persons involved in large-scale narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letter of credit, money orders, bank drafts, cashier's checks, safe deposit box keys and money wrappers. These items are maintained by the narcotics traffickers within their residences, businesses or other locations which they maintain dominion and control over;

i.   large scale narcotics traffickers often utilize electronic equipment such as computers, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described above; this electronic equipment is normally used and maintained in the narcotics traffickers residence, business or another location in which the narcotic trafficker maintains control;

j.  that when drug traffickers amass large proceeds from the sales of drugs that the drug traffickers attempt to legitimize these profits through money laundering activities.

19

To accomplish these goals, drug traffickers utilizing including but not limited to, domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency;

k.  that the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and narcotics transactions;

l.  that the Currency Transaction Report (CTR) (IRS form 4789), which is required to be completed and filed with IRS by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for narcotics traffickers when they attempt to negotiate their illegal profits at a financial institution;

m.  that, in order to evade the filing of a CTR, narcotic traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;  evidence of this "structuring" is commonly found in the narcotics trafficker's residence;

n.  that narcotics traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies.  In order to legitimize their spending, these traffickers

20

file tax returns reporting income commensurate with the amount of money they have spent during the year, which they feel can be traced and documented by the government. The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their residences and businesses.

52.     Drug traffickers are also known to use their vehicles to transport drugs, store drug proceeds and store records relating to their drug activities, such as gasoline tickets revealing out of town trips. Therefore, it is requested that all vehicles on the aforementioned premises be searched for evidence of drug trafficking.

53.     Drug traffickers often maintain in their wallet, purse or pockets, telephone numbers of drug associates, safe deposit box keys, cash receipts of expenditures or other documents such as business cards, providing leads to the disposition of drug proceeds. Therefore, it is requested that all aforementioned persons be searched for evidence of drug trafficking.

54.     Based on the foregoing, your Affiant further believes that probable cause exists to believe that on the premises, property and persons described herein there is to be found fruits, evidence and instrumentalities of criminal offenses against the United States to include Title 18, United States Code, Section 1956 and Section 1957 and Title 31, United States Code, Section 5313 and Section 5324, as well as evidence, fruits, instrumentalities of violations of Title 21, United States Code, Section 841 and Section 846. Attachment B sets forth items to be seized as evidence of the aforesaid crimes.

Respectfully submitted,

Torey Loftin
Special Agent
Department of Justice
Drug Enforcement Administration

Sworn to and subscribed before me this 25th day of February 2019, in Montgomery, Alabama.

STEPHEN M. DOYLE
UNITED STATES MAGISTRATE JUDGE
MIDDLE DISTRICT OF ALABAMA

22

## ATTACHMENT I

## PROPERTY TO BE SEIZED

(1)   Books, records, ledgers, and/or writings which record the receipt and/or distribution of controlled substances including marijuana as well as any other memoranda relating to the transportation, ordering, purchase, delivery and/or distribution of controlled substances, which writings and records are contraband as well as evidence;

(2)   Papers, tickets, notes, schedules, receipts, and other writings and objects including but not limited to gasoline receipts, air travel vouchers, and motel/hotel embossed articles, which do or tend to establish domestic and/or interstate travel in interstate commerce;

(3)   Addresses and/or telephone books and papers and other writings reflecting names, addresses, and/or telephone numbers as well as bills and paid receipts reflecting telephone toll records, any and all of which reflect the names, addresses, and telephone numbers of aliases or code names of both known and unknown co-conspirators in the above-described criminal activity, as well as other indicia of telephone usage and service including pay telephone usage which indicia includes, but is not limited to, telephone credit cards, large amounts of nickel, dime and/or quarter currency, and telephone paging devices which are carried on or about the persons to receive incoming notice or messages and which are activated by telephone usage;

(4)   Currency of the United States including paper and coin currency, also precious metals, jewelry, financial instruments, including but not limited to, negotiable commercial paper, and currency obtained, connected with and/or possessed to facilitate the financing of illicit drug trafficking;

(5)   Photographs and videotapes, in particular, photographs or videotapes of co-

conspirators, of assets, and/or of controlled substances;

(6)    Safes, strong boxes, and/or other secure receptacles for the maintenance of valuable items and/or important documents including books, records, and other writings as well as United States currency as described above, and any keys or other evidence of the existence and usage of any lockers, safety deposit boxes or other secure receptacles situated elsewhere than at defendant property;

(7)    Articles of false identification;

(8)    Radio electronic equipment including but not limited to transceivers, receivers, scanners, antennae, RF detectors, walkie talkies, wireless transmitters as well as other electronics which are used ancillary to such equipment, including but not limited to, electrical calibration equipment, meters and test equipment;

(9)    Computers or other electronic devices which are capable of storing information, including, but not limited to computers, lap tops, floppy disks, cd roms, zip disks, hard drives, and personal data assistants (PDA).

(10)    Firearms;

(11)    Controlled substances;

(12)    Paraphernalia for packaging, cutting, weighing, and distributing controlled substances, including but not limited to, scales, bags, pipes, and duct tape;

(13)    Any and all other material evidence of violations of Title 21, United States Code, Sections 841 (a) (1) and 846, together with fruits, instrumentalities and evidence of crimes at this time unknown.

**ATTACHMENT  C**

**PREMISES TO BE SEARCHED**

**54 Old Dam Road, Goodwater, Alabama 35072**

The property is further described as a single-family residence, red in color bricked. There are two driveway on the west side of the residence, and a trailer located directly behind this property.





1



2

## ATTACHMENT  D

### PREMISES TO BE SEARCHED

**Aerial View of**

**54 Old Dam Road, Goodwater, Alabama 35072**



